THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. HECTOR TROCHE and JUAN SOTO, Appellants.

BENJAMIN, J. (dissenting). The defendants were convicted of having murdered taxicab driver Arthur Abrams while engaged in the commission of a felony in the early morning of February 13, 1965. The only affirmative evidence linking them to the crime was furnished by Paul Gellman and Juan Balaguer.

Gellman, who had been at his garage around the corner from Junius Street, the scene of the crime, testified he heard three shots. Nine or ten seconds later three young fellows walked rapidly around the corner from the scene. As they approached Gellman, the one in the middle (defendant Troche) put his hand into his pocket. The youth on the right grabbed Troche's arm and said something in Spanish. The three then ran diagonally across the street, away from Gellman. Gellman identified Troche as the one in the middle. He was unable to identify the two others. His attention had focused on Troche because he was the tallest of the three. The prosecution's theory was that the felony underlying the homicide had been committed by Troche, defendant Soto and one Kenneth Stroman. Troche was in fact the shortest of these three.

Balaguer had been riding his bicycle to work along Junius Street at the time in question. He observed a taxicab proceeding at about five miles per hour. It stopped and started again and then stopped. When Balaguer proceeded about 50 feet past the cab, he heard three shots. Three young men came out of the taxi and then he heard a fourth shot. Balaguer looked into the taxi cab when he cycled abreast of it. He recognized those in the taxicab as Stroman and the defendants, Troche and Soto. Stroman was in the front seat next to the driver. Troche and Soto were in the back seat, Troche with a gun in his hand. After the shooting, two of the youths ran in a direction away from Gellman's garage. Two days later Balaguer was visited by Troche, who warned him to remain silent. Although Balaguer knew the identities of the persons he had seen in the taxicab, he concealed this fact from the police for four months. Alibi witnesses testified on behalf of each defendant. The proof in the case cannot be considered overwhelming.

Stroman, who had already pleaded guilty to manslaughter in the second degree, was called as a prosecution witness in the expectation that he would implicate the defendants. After testifying that he had not been in a certain bar on the early morning of February 13, 1965, that he had known the defendants for a period of time before that and that he had not been in a taxicab with them, he was declared a hostile witness. He was impeached through the use of a signed statement he had given at the office of the District Attorney.

The impeachment went far beyond the scope of his denials on the stand. He was asked whether certain questions had been asked and whether he had made certain answers. The jury was properly cautioned that they could not consider those questions and answers as testimony. This form of impeachment covered 19 pages in the record. In it were narrated all of the circumstances concerning the planning and execution of the crime, including the statements that the idea for the robbery had originated with defendant Soto and that Soto had originally been in possession of the gun.

Notwithstanding that proper instructions were given, it is difficult to believe that they were properly interpreted by the jury, as the statement used for impeachment went far beyond merely contradicting that to which Stroman had testified. As a result, the jury might well have believed that Stroman's prior statement had independent testimonial value (see *People* v. *Welch*, 16 A D 2d 554, 558, 559).

The use of the prior signed statement was authorized (Code Crim. Pro., § 8-a). The prejudice stemmed from the use of the statement for impeachment without having developed, by means of leading questions, that which the impeachment examination attempted to contradict. The prejudice was compounded when, on redirect examination, the prosecutor was permitted to establish that Stroman had made similar oral statements to an Assistant District Attorney prior to having signed the statement referred to above. This was an impermissible method of impeachment, as the oral statements were neither sworn to nor subscribed by Stroman (cf. *People* v. *Freeman*, 9 N Y 2d 600; *People* v. *Romano*, 279 N. Y. 392, 394; *People* v. *Kaplan*, 24 A D 2d 516). It cannot be justified on the theory that the prosecutor was attempting to refresh Stroman's recollection or to explain why he had been called to the stand (cf. *Bullard* v. *Pearsall*, 53 N. Y. 230; *People* v. *Sexton*, 187 N. Y. 495). This questioning was clearly intended to demonstrate that Stroman's later signed statement was truthful and uncoerced.

The fairness of the trial was also affected by reason of the prosecutor's opening statement. It too placed before the jury many facts concerning the crime which were never the subject of affirmative proof. The opening was particularly prejudicial to the defendant Soto who, as noted, was described as the originator of the plot and a possessor of the gun. It also adversely affected Troche, as the jury was told that as he approached Gellman after the shooting he had a gun in his pocket but Soto prevented him from using it.

These errors, while they may have been inadvertent, served to deprive defendants of their fundamental right to a fair trial and a decision based upon evidence properly before the jury.

Voluntary and unresponsive statements were made by witnesses attributing criminal records and acts to the defendants. These might well not have required reversal in an otherwise fair and impartial trial (cf. *People* v. *Casale*, 15 A D 2d 678; *People* v. *Sorrentini*, 26 A D 2d 827). In this case, they contributed to the prejudice sustained by the defendants.

The jury was instructed that they could find the defendants guilty of murder in the first degree either on a theory of felony murder or deliberate and premeditated murder. It was also instructed that it could find them guilty of murder in the second degree or manslaughter in either the first or second degree. In my opinion, this charge was erroneous as to defendant Soto. On the evidence before the jury he could only have been found guilty of felony murder. There was no proof properly before the jury from which it could be inferred that he had either committed the killing or had been aware that it was planned (see *People* v. *Martone*, 256 N. Y. 395, 397). However, the charge in this regard did not constitute reversible error, as Soto was convicted

of first degree murder committed during the course of the commission of a felony. The judgments should be reversed and a new trial ordered as to both defendants.

Rabin, Acting P. J., Munder and Kleinfeld, JJ., concur in memorandum; Benjamin, J., dissents and votes to reverse the judgments and order a new trial in opinion, in which Martuscello, J., concurs.

Judgments affirmed, etc.